# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 96-1892

_____

Joseph Amrine,                               *
                                             *
        Petitioner-Appellant,            *
                                             *
                                             *   Appeal from the United States
    v.                                       *   District Court for the
                                             *    Western District of Missouri.
Michael Bowersox, Superintendent,            *
Potosi Correctional Center,                  *
                                             *
        Respondent-Appellee.             *

_____

Submitted: October 17, 2000
Filed: January 5, 2001

_____

Before BEAM, MORRIS SHEPPARD ARNOLD, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Before the court is Joseph Amrine's petition for writ of habeas corpus under 28 U.S.C. § 2254. Amrine was convicted in 1986 for murdering a fellow prisoner, and he was sentenced to death. His conviction and sentence were affirmed by the Missouri Supreme Court, State v. Amrine, 741 S.W.2d 665 (1987) (en banc), as was the denial of post conviction relief, Amrine v. State, 785 S.W.2d 531 (1990). He filed this petition for federal habeas relief in 1990 and an amended petition in 1991.[1] The federal

---

[1]Amrine's petition thus predated the Anti-Terrorism and Effective Death Penalty Act of 1996.

district court[2] denied habeas relief in 1996 on the basis that his claims were either procedurally barred or without merit.  Amrine appealed, but before briefing his new counsel moved for a remand to the district court to present new evidence of actual innocence.  That motion was granted by this court en banc.  Amrine v. Bowersox, 128 F.3d 1222 (8th Cir. 1997) (en banc) (Amrine I).  After a hearing, the district court issued an order on October 30, 1998, finding that the new evidence was not reliable and that Amrine therefore could not make out a claim of actual innocence.  Unfortunately, the order was not forwarded to this court and not until March 2000 were we able to obtain a copy.  We then set an additional briefing schedule and oral argument.  We now affirm.

I.

Gary Barber, an inmate in the Missouri state penitentiary in Cole County, Missouri, was stabbed to death in a prison recreation room on October 18, 1985. Amrine was charged with the crime.  The state presented evidence at trial that Amrine had killed Barber and which suggested that it happened because Barber had told other inmates that he had had sex with Amrine.  Inmate Terry Russell testified that relations between Amrine and Barber were tense because of the rumors and that Amrine had confronted Barber and threatened him about a week before the murder.  Russell acknowledged that he had not seen the stabbing, but testified that Amrine later confessed to him that he had killed Barber.   Inmates Randy Ferguson and Jerry Poe both testified that they saw Amrine stab Barber.  The state also presented evidence that blood was found on the clothing Amrine was wearing at the time of the stabbing, but a state serologist testified that the blood sample was too small to determine definitively the source or age of the stain.

---

[2]The Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri.

Amrine's theory at trial was that Russell had killed Barber. Amrine called six inmates to testify that he had been playing poker at the other side of the recreation room at the time of the murder. Three of those inmates stated that they had seen Barber chasing an individual immediately after he was attacked, and they identified Russell as that individual. The state called Officer John Noble, who testified that he had seen Barber chase another inmate across the room before he collapsed and died. He stated that although he had initially identified that inmate to a fellow officer as Russell, he was not certain about that later and that Russell and Amrine were similar in size, coloration, and hair style. A correctional officer who had been stationed outside the recreation room testified that he saw Russell leave the room before the stabbing. A third officer stated that he saw Russell after the incident, both inside and outside the room.

The jury convicted Amrine of first degree murder, and the penalty phase of the trial commenced. The state called several prison employees who were familiar with Amrine to testify about him. One of these witnesses was Bill Armontrout, who was warden of the state penitentiary. Armontrout testified that based upon his personal experience with the Department of Corrections, he believed that imposing the death penalty for inmate-on-inmate homicides had an impact upon the prison population and deterred incidents of violence. Armontrout also testified that he had known Amrine since his incarceration and that he was not a peaceable inmate. The state presented other witnesses who testified that Amrine was an aggressive prisoner. Corrections Officer Steven Asher testified that he had seen Amrine chasing another inmate with a knife in 1982. Amrine testified on his own behalf. He admitted that he had had "a bad institutional record" in prison, that he had possessed knives on several occasions while in prison, and that he had once attempted to extort money from a fellow prisoner. Amrine testified that he did not hold any "hard feelings towards the jury" for convicting him and that he had not killed Barber. Amrine's counsel did not call any other mitigating witnesses.

After the jury returned a death verdict, the court sentenced him to death and judgment was entered. Amrine's direct appeal was unsuccessful, and the Missouri Supreme Court affirmed his conviction and sentence. Amrine then filed for post conviction relief, and a hearing was held. Both Ferguson and Russell testified at that hearing and recanted their trial testimony in which they had identified Amrine as the murderer. They claimed that they had been pressured by state investigators into giving false testimony in exchange for receiving protective custody. The state countered with the testimony of George Brooks, an investigator with the state prison system, and Richard Lee, an investigator with the county prosecutor's office, who denied pressuring Ferguson and Russell to give false testimony. The state court found that Russell was not a credible witness and that his recanted testimony was "designed solely to place him in good stead with Amrine." The court also found that Ferguson was not credible and that he had recanted his trial testimony in order to help a fellow inmate. The court denied post conviction relief, and the Missouri Supreme Court affirmed.

Amrine then filed his habeas petition in federal court, raising numerous claims of constitutional error. The federal district court considered the merits of claims which had been presented in state court and concluded that they did not entitle Amrine to relief. The remaining claims had not been "properly presented" to the state courts and were therefore procedurally barred. The court concluded that Amrine had failed to show either cause and prejudice to excuse his default or sufficient evidence of actual innocence to permit review of the defaulted claims. Although Ferguson and Russell had recanted their trial testimony, the court noted that "the testimony of Jerry Poe against petitioner remains unchallenged." Amrine v. Bowersox, No. 90-0940, slip op. at 15 (W.D.Mo. Feb. 26, 1996). The court concluded that despite the testimony by Ferguson and Russell at the state post conviction hearing that they had falsely implicated Amrine, "it cannot be said that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt in light of the continued existence of witness Poe's testimony." Id. at 16.

Amrine appealed the district court's denial of his habeas petition to this court. Before briefs were filed, Amrine's successor counsel located new evidence to support his claim that there was sufficient evidence of actual innocence to permit review of his procedurally barred claims. The major piece of new evidence was an affidavit from Jerry Poe disavowing his testimony at trial. Counsel had been unable to locate Poe while Amrine's habeas petition was originally pending in district court, but he was found when he was returned to the custody of Missouri authorities. Poe had been one of the two eyewitnesses who testified at trial that they saw Amrine kill Barber. In his new affidavit Poe claimed that he had not seen Amrine stab Barber and that he had falsely implicated Amrine under pressure from state officials. In light of this new evidence, Amrine asked for a remand for further consideration of his actual innocence claim.

We concluded that Amrine was entitled to a limited remand under Schlup v. Delo, 513 U.S. 298 (1995), because Poe's affidavit was new evidence which, if believed, would "directly contradict[] the key evidence against him at trial." Amrine I, 128 F.3d at 1228. Schlup provides that a habeas petitioner may obtain review of otherwise barred claims if he produces reliable new evidence not available at trial establishing that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. Id. at 1226-27. The district court was to conduct an evidentiary hearing to determine whether Amrine's evidence was "new and reliable." Id. at 1230. We pointed out that "evidence is new only if it was not available at trial and could not have been discovered earlier through the exercise of due diligence." Id. We recognized that the court might be required to make "credibility assessments" to determine reliability. Id. at 1228. If it were to find the evidence both new and reliable, the court was then to determine whether the evidence met the Schlup standard enabling the barred constitutional claims to be considered. Id. at 1230.

On remand, the district court held an evidentiary hearing at which both sides presented evidence. Amrine called former inmates Russell and Kevin Dean, and former

prison correctional officer Noble, and he presented videotaped depositions of Poe and Ferguson. The state presented the testimony of Thomas Brown, the prosecuting attorney at trial, Kevin Booker, an inmate who changed his story to say that he had seen Amrine kill Barber, and investigators George Brooks, Richard Lee, and Joe Dresselhaus.

The court considered the evidence in light of the remand order. The court found that only Poe's recantation was new evidence since Ferguson and Russell had changed their testimony before the court ruled on Amrine's habeas petition, Noble had presented substantially the same testimony at trial, and Dean had been available to testify but was not called. The court went on to evaluate the new evidence and found that Poe was not a credible witness and that his recantation was not reliable. Among the facts on which the court based this finding was Poe's unsubstantiated claim to have written recantation letters to the Missouri Supreme Court, United States District Judge Russell Clark, and the Governor of Missouri, but those officials reported that they had no such letters in their files. Poe had also refused to admit to his previous convictions for threatening to kill state prison officials and for threatening a prosecutor's daughter, and he admitted to "being angry at the state . . . thus possess[ing] ample motive to undermine the state's conviction of" Amrine. Amrine v. Bowersox, No. 90-0940, slip op. at 6 (W.D.Mo. October 29, 1998). Since the only new evidence proffered by Amrine was unreliable, the court concluded that no further Schlup analysis was necessary.

Amrine now appeals the district court's denial of his habeas petition. He challenges the court's finding that his proffered evidence was not sufficiently new and reliable to warrant engaging in a Schlup actual innocence analysis. He also contends that the district court erred in finding that he did not receive ineffective assistance of counsel at trial and that his rights under the Eighth and Fourteenth Amendments had not been violated. The state responds that the district court correctly found that Amrine did

not present sufficiently new and reliable evidence of actual innocence and that Amrine's trial was free of constitutional error.

## II.

A habeas petitioner who raises a gateway claim of actual innocence must satisfy a two-part test in order to obtain review of otherwise procedurally barred claims. First, the petitioner's allegations of constitutional error must be supported with new reliable evidence not available at trial. Schlup, 513 U.S. at 327-28. Second, the petitioner must establish "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Id. at 327.

Amrine contends that the district court erred in finding that his proffered evidence was not sufficiently new or reliable to warrant proceeding to the second step of the actual innocence analysis. He maintains that the district court misapplied Schlup when it considered only Poe's recantation for purposes of his actual innocence claim. The state contends that the district court correctly found that Amrine had not put forth sufficient evidence of actual innocence to permit merits review of his barred claims.

The district court followed our instructions on remand consistent with Schlup. It ruled that evidence is new only if it was not available at trial and could not have been discovered earlier through the exercise of due diligence. The testimony of Noble, Dean, Russell, and Ferguson was thus not new evidence, and the court did not err by deciding to focus on the testimony of Poe. The district court was to "make its own credibility determinations" in order to ascertain whether the new evidence proffered by Amrine was sufficiently reliable to warrant conducting a Schlup actual innocence analysis. Amrine I, 128 F.3d at 1230. After considering the videotaped deposition, the district court found that Poe was not a credible witness and that his recantation could not be relied upon. The court clearly explained its reasons for finding that Poe's testimony was not reliable. This is a credibility determination which is entitled to great

deference, and we see no reason to overturn it. <u>See</u> <u>Anderson v. City of Bessemer City, N.C.</u>, 470 U.S. 564, 573-74 (1985) ("[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently").

In order to prevail on his actual innocence claim, Amrine was required to show "new reliable evidence . . . not presented at trial establishing that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." <u>Lee v. Kemna</u>, 213 F.3d 1031, 1039 (8th Cir. 2000) (citations omitted). Amrine did not present such evidence, and consequently cannot utilize the actual innocence gateway. Thus, the merits of his procedurally barred claims cannot be considered. [3]

---

[3]Amrine's procedurally barred claims are summarized in his brief in the following way. First, he claims that his trial counsel was ineffective for failing to investigate Amrine's social, family, and medical history and for failing to request an evaluation by an appropriate expert. Second, he claims that trial counsel was ineffective for failing to request jury instructions relating to the credibility of inmate snitches. Third, he claims that his trial counsel was ineffective for failing to take appropriate steps to prevent him from being tried by an all white jury. Fourth, he claims that his trial counsel was ineffective for asserting Amrine's privilege against self-incrimination in the presence and hearing of the jury. Fifth, he claims that trial counsel failed to object to the prosecutor's improper closing arguments. Sixth, he claims that his trial counsel was ineffective and his presumption of innocence violated, when he was required to walk past the venire panel in full restraints. Finally, he claims that his right of due process was violated by the withholding of exculpatory evidence and that his conviction is based on evidence which the state knew or should have known to be false. App. Br. 59.

III.

Amrine also appeals the disposition of his non-procedurally barred constitutional claims. Amrine has briefed four constitutional challenges to his conviction and sentence. First, he claims that he received ineffective assistance of counsel during the guilt phase of his trial. Second, he claims that the admission of Warden Armontrout's testimony at the penalty phase violated his rights under the Eighth and Fourteenth Amendments and that his attorney was constitutionally ineffective in failing to rebut and object to this testimony. Third, he claims that his trial counsel was ineffective in failing to present mitigating witnesses to testify on his behalf at the penalty phase. Finally, he claims that admission of evidence in the penalty trial that he had previously assaulted a fellow inmate violated his rights under the Eighth and Fourteenth Amendments and that his attorney was constitutionally ineffective in failing to rebut and object to this evidence. We review the district court's denial of these constitutional claims de novo. See Richardson v. Bowersox, 188 F.3d 973, 977 (8th Cir. 1999).

A.

Amrine contends that his counsel rendered ineffective assistance during the guilt and sentencing phases of his trial. He complains that at trial his counsel failed 1) to cross examine state's witnesses Ferguson and Poe adequately about prior inconsistent statements about the crime; 2) to impeach the credibility of Russell; 3) to interview other witnesses who would have testified that Russell had killed Barber; and 4) to elicit evidence diminishing the probative value of the blood found on Amrine's clothing.[4]

---

[4]Amrine also contends that his trial counsel had a conflict of interest because he was from the same public defender office as the attorney who represented Ferguson. Because Amrine has not produced evidence to suggest that his counsel actively represented conflicting interests or that an "actual conflict of interest adversely affected his lawyer's performance, this claim fails. Strickland, 466 U.S. at 692 (citations omitted).

To establish a claim of ineffective assistance of counsel, a petitioner must establish that counsel's performance was deficient and that he was prejudiced by that deficient performance. See Strickland v. Washington, 466 U.S. 668, 687 (1984). There is a strong presumption that counsel's conduct falls within the wide range of professionally reasonable assistance and sound trial strategy. Id. at 689. The challenged conduct is to be evaluated in light of the circumstances surrounding the decision, not with the 20/20 vision of hindsight. Id. In order to establish prejudice, a petitioner must demonstrate that "there is a reasonable probability that, absent [the counsel's unprofessional] errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. A reasonable probability is one "sufficient to undermine confidence in the outcome." Id. at 694.

Amrine's claim of ineffective assistance at the guilt phase of trial fails because he has not shown that he was prejudiced by his counsel's performance. Amrine's counsel called witnesses, put in exhibits, and cross examined the state's witnesses. Counsel called six inmates to testify that Amrine was not the killer. The state serologist admitted that he could not definitively trace the blood on Amrine's clothing to Barber. Even if counsel had cross examined Poe about a prior inconsistent statement to investigators about the murder, impeached the credibility of the state's inmate witnesses, and called additional witnesses favorable to Amrine, a reasonable probability does not exist that "the results of the proceeding would have been different." Id. at 694. There was strong evidence presented by the state, and the jury evaluated the credibility of the various witnesses and found the state's witnesses more believable. We cannot say that a reasonable probability exists that the jury would not have found Amrine guilty if his counsel had also undertaken the additional measures now advocated. Because Amrine has not shown that he was prejudiced by counsel's performance at the guilt phase of trial, we need not discuss whether it was outside "the wide range of professionally reasonable assistance."

-10-

Amrine also contends that he received ineffective assistance at the penalty phase of his trial because his counsel failed to rebut and object to the testimony of Warden Armontrout. We disagree. Amrine's counsel raised an objection to Armontrout's testimony, but the state court overruled this objection. Counsel was not constitutionally required to raise additional objections. A review of the record reveals that counsel adequately cross examined Armontrout, and it may well have been sound trial strategy not to call rebuttal witnesses who could further emphasize his testimony.

Armontrout testified that no murders were committed in the penitentiary for thirty months after an inmate was sentenced to death in 1982. Amrine claims that this testimony was "demonstrably false" and that his attorney was deficient in failing to cross examine Armontrout about it. Prison records indicate that although there were no murders in 1982 or 1983, there were three prison murders in 1984. It is not clear however that Armontrout's testimony was "demonstrably false," and Amrine has not shown that counsel's failure to cross examine him about the exact timing of these other prison murders was constitutionally deficient.

Nor can Amrine show that he was prejudiced by his counsel's failure to call rebuttal witnesses against Armontrout. The state presented numerous witnesses at sentencing who were familiar with Amrine's behavior and who characterized him as an aggressive inmate. Amrine himself admitted that he had "a bad institutional record," that he had possessed knives in prison on at least four occasions, and that he had previously attempted to extort money from another prisoner. Given that this extremely damaging testimony was already before the jury, no reasonable probability exists that the result of the proceedings would have been different if counsel had called witnesses to rebut Armontrout's testimony.

Amrine also maintains that his counsel was ineffective because he failed to investigate whether there were any witnesses willing to testify on his behalf at the penalty trial. At the state post conviction hearing, prison staff member Bob Faith and

several members of Amrine's family testified on his behalf. His family members testified that he was a caring person, that they loved him, and that his life had value. Faith, who taught a General Equivalency Diploma class which Amrine attended, testified that he regarded Amrine as a well adjusted and nonviolent inmate and stated that he would have testified at trial that he was "very much surprised" when he heard that Amrine had been accused of murder. At the state post conviction hearing, trial counsel testified that Amrine had not requested any mitigating witnesses, but Amrine claimed that he had never been informed that he could call such witnesses.

We agree with the district court that Amrine's counsel did not fulfill his obligation to investigate adequately whether there were witnesses willing to testify on his client's behalf at sentencing. See Laws v. Armontrout, 863 F.2d 1377, 1385 (8th Cir. 1988) ("[i]f counsel through neglect failed to discover [mitigating] evidence [at sentencing], then counsel will be found ineffective"). Nevertheless, Amrine has not shown that he was prejudiced by his attorney's deficient performance. The proposed testimony of family members would have been cumulative and similar to that of Amrine himself, which was essentially a plea for mercy. The state presented numerous witnesses who testified to Amrine's aggressive conduct, and Amrine himself admitted that he had possessed knives on several occasions in prison. Given the large amount of damaging evidence, there is no reasonable probability that the ultimate result of the penalty trial would have been different if Faith and Amrine's relatives had been called as mitigating witnesses.

B.

Amrine also contends that other constitutional rights were violated by the admission of the testimony of Armontrout at the penalty phase of trial. At the time of Amrine's trial, Armontrout was the warden of the state penitentiary. Among other things, he testified at sentencing that it was his belief that when an inmate was sentenced to death for murdering another inmate, it had "quite an effect" on the prison

population, whereas the imposition of a life sentence had "very little effect." (Tr. 778.) He testified that "I think we have had less acts of violence" after the imposition of a death sentence and that "we went 30 months without a murder" after an inmate was sentenced to death for murdering another inmate in 1982. Amrine contends that the admission of this testimony violated his right to be free from cruel and unusual punishment and his due process rights under the Eighth and Fourteenth Amendments. According to Amrine, Armontrout's testimony was constitutionally infirm because it did not lead to an "individualized determination" as to whether the death penalty was appropriate in his case and because it was based upon scientifically unreliable and demonstrably false evidence.

The Supreme Court has stated that "in capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson v. North Carolina, 428 U.S. 280, 304 (1976) (internal citations omitted). Yet while the Constitution requires "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime," at the penalty phase of the trial, it "does not require the jury to ignore other possible aggravating factors in the process of selecting . . . those defendants who will actually be sentenced to death." Zant v. Stephens, 462 U.S. 862, 878-79 (1983) (emphasis supplied).

The admission of Armontrout's testimony on the possible deterrent effect of the death penalty on the prison population did not prevent the jury from making an individualized determination as to whether capital punishment was appropriate in Amrine's case and thus did not violate the Constitution. Nor can Armontrout's testimony be characterized as scientifically unreliable or demonstrably false. Armontrout never suggested that his opinion on the deterrent effect of the death penalty was based upon scientific or statistical evidence. Instead, the record indicates that he made it clear that this was his personal opinion, garnered from his years of working in

-13-

the Missouri prison system. Finally, even if a homicide had occurred during the 30 month period cited by Armontrout as being murder free, it would not render his testimony so demonstrably false or materially inaccurate as to violate the Eighth Amendment. Cf. Johnson v. Mississippi, 486 U.S. 578 (1988) (Eighth Amendment violated when death sentence based, at least in part, upon vacated felony conviction). In any case it is undisputed that there were no inmate murders for a long period after an inmate was sentenced to death in 1982.

To determine whether a due process violation has occurred, a court must examine the totality of the circumstances and determine whether "the error was so gross, conspicuously prejudicial, or otherwise of such magnitude that it fatally infected the trial and failed to afford petitioner the fundamental fairness which is the essence of due process." Mercer v. Armontrout, 844 F.2d 582, 587 (8th Cir. 1988) (citations omitted). Amrine has not shown that the admission of Armontrout's testimony so fatally infected his penalty trial that it resulted in the denial of due process.

Amrine has not established that the admission of Armontrout's testimony at the penalty trial violated his constitutional rights. We accordingly affirm the district court's denial of this claim.

C.

Amrine also argues that the introduction of evidence at the penalty phase which linked him to the 1984 stabbing of inmate Willie Dixon violated his Eighth and Fourteenth Amendment rights. The district court denied these claims on the grounds that Amrine did not raise them in state court. Amrine appears to argue that he properly raised his Eighth and Fourteenth Amendment claims on direct appeal. We conclude that these claims were not properly preserved. We can therefore reach the merits only if Amrine can show cause for his default and prejudice or actual innocence. Lee v. Kemna, 213 F.3d 1037, 1038 (2000). Amrine states simply that his procedural default

should be excused because "cause and prejudice exists due to the ineffectiveness of counsel on direct appeal" and because his claim is "reviewable under the actual innocence exception." He did not attempt to elaborate on the basis in the record for this argument. Because Amrine has not shown cause for his default or actual innocence, the district court was not required to reach the merits of these claims.

## IV.

After a careful review of the record, we conclude that Amrine has not shown actual innocence entitling him to review of his procedurally barred claims or that his constitutional rights were violated. We therefore affirm the judgment of the district court.

A true copy.

    Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-15-